Good morning, your honors. My name is Jennifer Turrillo, formerly Jennifer Medmold when the briefs were written. And I represent the Village of Oak Lawn, the Appalachian Cross Appalachian. Lisa Moss on behalf of Local 3405, IAFF, Oak Lawn Firefighters. And again, I represent the Appalachian Cross Appalachian. Okay, we've got 15 minutes apiece for each of you. If you want to reserve time for rebuttal, please do so. We don't have another case after, so we'll probably be a little liberal on that. And we're going to do our best to give you some time right off the bat without interruption to get your points across. And then we'll probably irritate you with some questions. Okay? Thank you. Please proceed. May it please the Court. Again, my name is Jennifer Turrillo, representing the Village of Oak Lawn in this matter. In preparing for oral argument today, I tried to come up with an overreaching theme, if you will, that will govern my discussion with you today. And the theme that I came up with is that discretion to the role and function of an arbitrator does not mean that an arbitrator gets a hall pass to do whatever it is he or she wants. Judicial review of arbitration awards is limited. I'll acknowledge that. We've acknowledged it in our briefs repeatedly. But that does not mean that an arbitrator's conduct is beyond reproach. There are instances where arbitration awards are and have been reversed and vacated on appeal. Two cases just in 2010 from this Court, the AmeriShare case and the Chicago Transit Authority case, were cases where an arbitration award was reversed. The Court is duty-bound to affirm an arbitration award only when the award draws its essence from the collective bargaining agreement and when an arbitrator doesn't exceed the scope of their powers. And we don't have those two principles here. In fact, there are several reasons why this case presents an appropriate instance, four reasons to be exact, for judicially disturbing this arbitration-awarded issue. And those reasons are as follows. Number one, the grievance wasn't arbitrable in the first place due to the union's failure to comply with the grievance processing procedure set forth in the collective bargaining agreement. Additionally, a second reason, the arbitrator in this case decided issues that went beyond the scope of this particular grievance, and that's in violation of the collective bargaining agreement. Third, in endeavoring to interpret Section 7.9 of the collective bargaining agreement, and that's the provision of the agreement that is labeled minimum manning, the arbitrator actually rewrote the contract, added to it, put things in the contract that aren't in there. And that, of course, is also violative of this particular collective bargaining agreement. And finally, the award issued by the arbitrator violates paramount considerations of Illinois public policy. It is for those four reasons that we are seeking to reverse and have this award vacated either in whole or in part, and I'll explain these issues in greater detail. As I stated, the union failed to comply with the grievance processing procedure set forth in Sections 4.2 and 4.4 of the collective bargaining agreement. And as a consequence, the arbitrator lacked jurisdiction to consider the merits of this grievance. The problems that stripped this arbitrator of jurisdiction to consider the merits of the grievance occurred in Step 3 and 4 of the grievance processing procedure. This is set forth in detail in our brief. And this appeal is, and this issue is, and I don't mean it to be as dry as toast, but there are a couple of facts that are key to understanding this procedural arbitrability issue. A Step 3 meeting, as defined in the contract, occurred between the village manager and union officials on February 7, 2008. For nearly two months after that meeting, no activity occurred with respect to this grievance. Nothing. Not until March 24, 2008, when a letter was sent from the union's president to the village, and that letter had three purposes. It inquired into the status of the grievance and noted that an answer had not been issued after the Step 3 meeting. The letter also sought to resolve the grievance, if possible. And finally, the letter threatened to pursue arbitration in the event the grievance could not be resolved. Following the March 24 letter, on March 31, the village manager penned a letter back to the union indicating that, indeed, he had not issued a Step 3 answer. He didn't see that one was necessary because he agreed with the Step 2 answer that had come before it. At that time in that letter, the village manager also noted that it was the village's position that the timeframe within which the union could move the grievance forward into arbitration had already lapsed. The next letter that comes in the sequence of events is an April 17 letter that the union sent to the Federal Conciliation and Mediation Services, seeking an arbitration panel. Those are the four main dates we're dealing with on the procedural arbitrability issue. The arbitrator, in deciding that he had jurisdiction to consider the grievance, made several inconsistent findings. The first of which, the arbitrator says, the union had an absolute right to receive a Step 3 answer from the village before it had to invoke arbitration under Step 4 of the collective bargaining agreement. The problem with that finding is that it's not supported by the collective bargaining agreement. The collective bargaining agreement contains a section, it's Section 4.4, it's entitled Time Limits. And that provision states that if the village fails to provide an answer at any particular step in the grievance process, that the union may appeal to the next step. Reading Section 4.2 of the CBA with Section 4.4, the village submits that it was incumbent on the union, after the 10 days passed, for Mr. Deachin to send a Step 3 answer to the union, for the union to then invoke arbitration. In other words, arbitration needed to be invoked by no later than February 27, 2008. And again, it's the village's position that here, arbitration was not invoked until April 17, 2008. Another problem, another inconsistency in the award with respect to the procedural arbitrability issue, is that the arbitrator found that Mr. Deachin's March 31st letter was a Step 3 answer. The problem with that is that if you look at the contents of the letter, it says, I never issued a Step 3 answer. Also, Mr. Deachin testified at the arbitration hearing that he never issued a Step 3 answer. Another problem with this finding, another finding that the arbitrator made, was that the union's March 24th letter constituted a timely invocation of arbitration under Step 4. Well, that's inconsistent with the arbitrator's finding that there had to be a Step 3 answer, before there could be invocation of arbitration under Step 4. So, the way that the arbitrator resolved the procedural arbitrability issue, it's littered with inconsistencies and it can't stand. Was there a way for the village to object to even selecting an arbitrator because of the procedural failure? Well, not necessarily, because we're not contesting that that was an appropriate issue for an arbitrator to determine. At the outset, we had told the union that we had an issue that we were going to raise with the arbitrator. We were going to file a motion and we did file a motion. But I think the issue itself, we're conceding that it was appropriate for the arbitrator to pass on the issue. It's that he got it wrong and he manifestly ignored certain provisions in the collective bargaining agreement. What's our standard of review on that particular issue then? Where you say that it's okay for the arbitrator to look at it, but you just think he just got it done wrong. Here, the standard of review I'm going to tell you is de novo, because all of this was resolved by the trial court under a summary judgment motion. This particular issue was looked at by the trial court in the context of summary judgment, and we did not prevail in front of the trial court. How do you square that? I think you're right, based on everything that you've presented to us, both sides have presented to us. How do you square that with the fact that the court is supposed to give great deference to what the arbitrator did? Again, I'd go back to my theme. How do you put the two together? Deference doesn't mean the arbitrator gets a hall pass to ignore the collective bargaining agreement. And here, this procedural arbitrability issue. I don't mind the argument. I'd just like to see a case that says that. And I want to make sure I've got it straight. Is it one of those, the CTA case or the other case that you mentioned? Sure. Yes, that's correct. Again, we could go back to, and I'm sorry, I don't have the case at my fingertips, but a court is only duty-bound to affirm an ARB award when it draws its essence from the collective bargaining agreement. And the problem here is that on this particular issue, the finding doesn't draw its essence from the collective bargaining agreement. In fact, it ignores provisions in the collective bargaining agreement. It ignores Section 4.4 because 4.4 is entitled time limits. That means there is a time frame within which the union must act to move a grievance forward. It's not that a grievance remains perpetually viable. There are things that have to be done in the face of a village not providing an answer. The not providing of an answer was not a contingency. It's something that the parties planned for. So then is it sort of a mixed standard of review? Are you suggesting that we look at it de novo, we give the arbitrator great deference, but we have to see whether or not he abused his discretion? I mean, how would you articulate how it is that we're supposed to review it standard-wise? The case is coming to you based upon the granting of a summary judgment on a motion to affirm an arbitration award or a counterclaim to affirm an ARB award. That makes the standard de novo. But I'm acknowledging that there is great deference owed to an arbitrator, but only when the award draws its essence from the collective bargaining agreement and you can find that the arbitrator did not exceed his or her powers. And it's that problem that we have here. So I think, yes, it's de novo with deference, but not the abuse of discretion part. De novo. It's a difficult dichotomy. It is. It is. And there isn't a case that either side has pointed to that necessarily addresses this issue. The case that we cited in our standard of review section, our brief, was a case where it was, again, a summary judgment granted on affirming an arbitration award, and someone challenged it, and it was de novo review. That's all that was said by the court in that particular case. If you could give us that. I will. I'm sure it's right in there. It is. That is the Illinois State Police v. Fraternal Order of Police Troopers, Lodge No. 41 case. And it was a conducting of a de novo review of a trial court summary judgment order that denied a motion to vacate an arbitration award. If we could urge you gently to go to the issue of the ambiguity or lack thereof of the minimum manning and the different pieces of equipment. Absolutely. Thank you. That was issue three that I identified. And the way I phrased the issue was that in endeavoring to interpret section 7.9 of the collective bargaining agreement, we have an arbitrator that essentially rewrote that portion of the contract. The arbitrator found that best efforts, that term, was not defined as used in section 7.9B of the contract. And because of that, the arbitrator believed that he had the right to look at extrinsic evidence, including testimony that he heard at the arbitration hearing about the party's past practices. And that testimony came from the former fire chief at the village, Chief McCafflin. The problem with that finding is that the village submits the contract isn't ambiguous at all. I think the issue here is that the ---- The contract talks about the manning of squads. Well, section 7.9B talks about minimum manning in terms of apparatus minimum manning. And the way the contract reads is if an apparatus is in service, we will put this many individuals on that particular apparatus. The way the arbitrator determined or read section 7.9, the village is stuck employing 21 employees on every shift. It's a stagnant number. No matter what the circumstances are, the village can't change it. Twenty-one bargaining unit employees on every shift. And the arbitrator found that all fire apparatuses have to be in operation at all times. There is not an option for the village to take an apparatus out of service. So the village, the testimony was the village had three shifts and three stations. The shifts were 24 on and 48 off. Correct. And in each station, they had one engine, at least one ambulance. Correct. I think the testimony was that now they have four ambulances, which are the ALS ambulances. So there's a fourth one sort of floating. And one squad that also floats in the squad is not a bunch of guys, but is a piece of equipment. Correct. And then a battalion chief is there, right? That's correct. So if the minimum and the union is saying you have to have these 21 people no matter what equipment you're running. Correct. And, oh, by the way, the union is saying the contract requires you to run a specific number of engines, a specific number of ambulances, and a specific number of squad equipment. And the village is saying show me where it says we have to run this number of pieces of equipment. That's correct. We'll use our best efforts. And if a particular piece of equipment is in operation, we will staff it as best we can in accordance with the numbers that are set forth in Section 7.9B. Where is the testimony about best efforts? There isn't, well, the best, well, the testimony that goes to best efforts really came from the village manager, if anywhere, Larry Deachin, talking about the budget constraints of the village and that given that the village was facing in the year 2007 a $2 million budget deficit, the fire department in 2007 had exceeded its overtime budget by more than $50,000. I'm sorry. I don't mean to interrupt. I'm asking you not where he was testifying about the finances. I'm asking you where he testified about the village's best efforts. That language, you won't find it in the transcript. He didn't give an opinion about the contract and its use of the language of best efforts. But we have an arbitrator that's determined that the language is ambiguous. We don't think it is. Nowhere in that provision does it say we'll have 21 people on shift at all times and it's an unchanging, unvarying number. Okay. So was the arbitrator saying that the language, the best efforts language was ambiguous as to the number and pieces of equipment or as to the number of people on each shift or both? Both. Okay. As I read the decision. But, again, it's not ambiguous at all. The provision provides that if a particular piece of equipment is in operation, we will use our best efforts. It says we will maintain and use our best efforts to maintain the following apparatus minimum manning requirements. It's not a shift minimum manning. It says apparatus. And that's something the arbitrator here overlooked. I want to make sure I touch upon very quickly. How can you talk about the apparatus without talking about the shifts that men are going to be assigned to it? Well, it's not, but the contract doesn't express it in terms of a shift, a level of employment at a shift level. It says apparatus minimum manning. And one thing that is in the record, for instance, there was negotiations and some testimony about contract negotiations for a collective bargaining agreement to be in effect from 2007 to 2010. And one of the proposals that went back and forth between the village and the union was a proposal to put in the contract a provision that said we'll employ 21 people on every shift. But that's not what this contract says. That's not what the 03-06 CBA says. It talks about and expresses an apparatus minimum manning requirement, not shift minimum manning, so that if we've got an apparatus in service, an engine, we're going to staff it with four firefighters. But as it is now, we're stuck with this notion from this arbitrator that we're stuck with 21 employees on every shift and we can never take an apparatus out of service, not ever, not for any circumstances. We have no leeway. And the village is saying there's nothing in this contract that requires specific apparatus at all, let alone per shift. Correct. That's our position. I want to make sure I touch upon briefly as well the violation of public policy argument. I think that's also a very strong argument that we have. The Illinois Labor Relations Act Section 4 specifically talks about matters of inherent managerial policy and standards of service, levels of service are part of that sphere of managerial prerogatives that are not subject to bargaining whims. And we believe, it's our position, the village's position, that the arbitration award here violates that public policy. In that, again, there is this notion that because of this contract, we have a stagnant level of employees that must be on shift at all times. We have no leeway to take out an apparatus from service. And we believe this finding interferes with our public policy rights. The Illinois General Assembly is accorded to the village to run its department. I'd also note that Section 3.1 in the Collective Bargaining Agreement is a management rights provision that talks about, it says that the village has the right to determine the standards of service offered to the public, to direct the working forces, to plan, direct, control, and determine the operation of fire department services. So we'd also contend that the arbitrator's finding that there's this stagnant, unvarying level, 21 employees have to be on shift at all times, apparatuses can't be taken out of service. If they have that management responsibility and it's afforded to them by the agreement, by the General Assembly, then why is all this information about the different apparatus and the number of people to work on them, why is that in the agreement? Because the two parties clearly disagree about what the agreement says. We don't view it as a shift minimum manning provision. It's an apparatus minimum manning provision, and that's what best efforts go to. How can you man it other than on a shift basis? Are you saying that there's supposed to be men on there 24 hours a day? Can you employ firefighters to work 24 hours a day? No, that's... I must be missing something, if you could help me out. And I want to make sure I understand your question. I think the parties disagree. The union is going to say that the contract provides a shift minimum manning. It talks about daily minimums, if you look at Section 7.9A. But then in Section 7.9B, there is the notion of best efforts to maintain apparatus minimum manning requirements. If it was a shift provision, it would say that, but it doesn't. Well, let's say it's not a shift provision and you have two paramedics per ambulance. They have to work 24 hours? Yes. You've already answered, and I think the testimony was that the shifts are 24 on and 48 off. That's correct, yes. If it's a firefighter slash paramedic who's assigned to a station, say Station 1, would expect to be there for 21 or 24 continuous hours and then go home for 48 hours? That's correct, yes. Okay. Maybe that helps a little bit. I don't want to necessarily delve into the cross-appeal issues until I've had a chance to hear what the union's attorney has to say. I'm more than happy to answer any other questions you have about my appeal, the village's appeal. I do have a question. The contract calls for 12 lieutenants, 18 engineers, and 24 firefighter paramedics. As I recall, there was testimony that the village now has 30 firefighter paramedics. Is that correct? That's correct. It was changed. And that's not in the contract? Correct. But when you were dealing with the 12, 18, and 24, that would have given you 54 bodies, 54 people mixed up somehow. And if you divided that by shift, that would have been 17 people per shift. Is that right? I believe so. Okay. And if you divided it by station, it would have been 5.66 people per station per shift. So I've been having trouble with the math as the arbitrator was having trouble with it. It seems that the actual practice never followed what was required in the contract to begin with, because if they were asking for 17 people per shift in the contract, based on the three lieutenants, the six engineers, and the eight firefighter slash paramedics, what in fact they were running with, this is according to, I think, Chief McCaslin on page 107 of the testimony. Station 1 had 28, engine 28, with four people. Medical unit 1 with two people, that's six per shift. Station 2 there, engine 27, medical unit 2, with four and two people respectively, that's another six. And then at station 3 they had engine 26, medical unit 3, and squad 1, which there's only one squad. And sometimes they would run it with two and sometimes they would run it with four. So they were either running that shift, both shifts, with 21 people or 23 people, and they were only required to have 17 people. Is that right? I'm not sure that that's correct. There is confusion about the past practice as opposed to the number of people that was required. Do you agree on that? I would agree on that. And another instance where that's come up is, and this is also memorialized in testimony, originally, for instance, there were, I think, three people running on the squad, and then there was an agreement struck between the union and the village that wasn't memorialized in writing to reduce the squad to two people. I guess my question goes to whether or not the squad, there was ever any agreement about how many people were going to be on the squad because they appear to have run it with two people, with four people. At one point, I think there was testimony that they actually ran it with five people and they had to take an engine out of service. But the larger issue is whether or not the village has the right to just say we're not going to have any squads. Was it Chief McCafflin that said in his testimony that it was the village's prerogative to take a piece of equipment out of service? That would have been Chief Foyard. Chief McCafflin was a union witness who testified that he was one of the proponents of Section 7.9. It was written so that to insulate the department from changes on the Board of Trustees at the village, to insulate the department from economic changes. The issue is he did not want the fire department running on shift with less than 21 people being employed. How would the village define out of service? Do you mean just broken and getting fixed or just gone forever? No, just the option that if we don't have sufficient personnel that day to run the squad at full power, then the people. When you say run the squad, what are you making reference to? The squad is a search and rescue apparatus. It has special extraction equipment. I think what you might be getting at, there was testimony, and it is confusing, but there were directives that went out. Before this grievance was filed, there were directives that went out from the division chief and the department chief that talked about the scenarios that the village was going to work with to man equipment with less than 21 individuals on shift. And I think that might be what you're referring to when you're talking about, well, we could man the squad with four or we could man it with two. There were directives that went out to deal with what we're going to do on a particular day if we don't have 21 people. Is there anything in the agreement that says that the village does or does not have the right to take pieces of equipment out of service? Nothing specifically in the agreement, but I would point out, I would point to section 3.1, which is the management rights clause in the agreement that talks about that the village has the right to determine the level of service and to determine how the fire department is going to operate. So could the village then decide, you know what, this whole squad thing, we don't need it anymore. Let's just bail on that. That will save us, you know, $150,000 a year. Of course there would come a point, and I had a feeling I was going to get asked this today, where's the limit on the managerial authority? You know, we could talk to those folks at Evergreen Park. You know, we get along with them great. They border us. They have a squad. We can just borrow theirs if we ever, on the odd occasion, we might need it. You know, and I'm sorry. In this instance, if Manning fell below 19, then the village would hire back. That was the threshold, as I understand it from reading the testimony. It's not in the contract, but that was the practice, correct, in the directives that got issued. Theoretically, the management, the village board, the village manager could say, you know what, let's not even have a fire department. Let's not have any engines. Let's not have any of these people. We'll just use the services of some other community and pay them when we need it. That could happen. That's not what happened here, and I would have a much harder case to make if that's what did happen, and I'll admit that. Realistically, the residents of the village may have something to say about that as well. Absolutely. So there's a balance, a checks and balances there. Correct. Counsel, are you conceding that the minimums are mandatory? I'm sorry. Are you conceding now that the minimum Manning requirements in 7.9 are mandatory? No. What I'm saying is that the contract, it's unambiguous. It talks about an apparatus minimum Manning requirement. The fact that there's best efforts language in it, I would submit to you means it's not mandatory. It's that we will use our best efforts when an ambulance is in service to make sure that there are two people on it. When an engine is in service, we're going to do our best to make sure we've got four firefighters assigned to that. But this notion that there's a requirement that 21 people must be on shift and we can never take an apparatus out of service is not in this contract. And by finding otherwise, we believe the arbitrator rewrote the contract. It wasn't there, and that wasn't within the arbitrator's prerogative to do. But you would agree that if you're running a squad, the contract requires three people to be on it. Best efforts to get three people on it. I just have one other question. Or two, I should say, in light of the agreement that there would be two people running. One of the arguments that you made in your brief was that the arbitrator got into the number of people on a fire engine, and that's a subject of a different grievance. Is that the 709-1 grievance? I believe so, but I need to look at the record. I'm not sure that that grievance ever got fully processed based on this arbitrator's decision in this case. Is it your argument that this particular grievance is only about the squad and how the squad being in or out of service affects the number of people who are on or not on duty and who get called or don't get called for overtime, all related only to the squad? It is my position, yes. Thank you. Thank you. Don't worry about that. Is there a different one I should worry about? No. It's not really a microphone anyhow. It's the recording equipment that we use for the online services. You still have to speak into it, but it doesn't make you any louder. Okay. Please speak up. Thank you. Thank you. Obviously, we have a lot to cover, and I'd like to start out with the judicial review of arbitration warrants. There were some questions raised and some cases I'd like you to take a look at. I would almost describe the standard as a hybrid one in this case, although the standard of review is de novo simply because the case was decided by the lower court, the trial court, on summary judgment. Judicial review of labor arbitration cases is extremely limited. I don't think there's any dispute. The award has to be enforced if the arbitrator acts within the scope of his authority and the award draws its essence from the collective bargaining agreement. I would urge the court to take a look at the Ask Me v. Department of Central Management Services case at 173 Illinois 2nd, 299, a 1996 case, where the court found that a court is duty bound to enforce an arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the collective bargaining agreement. And in deciding whether an award draws its essence from the collective bargaining agreement, it doesn't matter whether this court agrees with the interpretation. What it really needs to look at is did the arbitrator, in fact, analyze the contract, look at it, interpret it, and unless no reasonable mind could draw that same conclusion, that award must be upheld. These standards are derived from public policy considerations that there should be finality of arbitration awards, and it's not surprising that there aren't a lot of cases on this in Illinois, and simply because, as the federal courts have made clear in these cases, you better have a viable case if you're going to use the court system to try and overturn an arbitration award. With this background, I'd like to briefly go through the underlying award in this case and talk on each issue as to why it was properly confirmed by the circuit court and ultimately why sanctions should have been awarded pursuant to Section 137 of the Illinois Supreme Court. The first argument raised by the village in this case is the arbitrator lacked jurisdiction to hear the merits of the case as the grievance was untimely. There's no question in this case that the issue of whether the grievance was timely, as counsel concedes, was properly before the arbitrator. He had the authority to resolve the issue. In doing so, he looked at Step 4 of the party's grievance mechanism, and he determined in Step 4 of the party's grievance mechanism that the written notice of a party's intent to arbitrate shall be given within 10 calendar days, quote, of receiving the answer in Step 3. He also looked at Section 4.4 of the contract, and in that it said if the village fails to provide an answer within the time limit, the union may appeal, not shall, may appeal. There was no Step 3 answer from the village, and the arbitrator found that the village, in essence, was asking him to write in language into the contract, which pursuant to Article 4 of the contract, he's prohibited from doing. Specifically, he found that the village wanted him to read into the contract that the union had to invoke arbitration within 10 calendar days of receiving the answer in Step 3, or, quote, the date such answer is due. He correctly found he couldn't modify the contract language. There are a whole slew of cases, the AFSCME cases, the Kalish cases, the Steelworkers Trilogy cases. All these cases support a long historical contention that doubts as to whether a grievance is arbitrable must be found in favor of arbitrability. He went on, the arbitrator, to then take a look at a March 24th letter written by the union president. And at some point, I would urge the court to take a look at page C411 of the record in this case, which is the second page of that letter. And in that letter, the union president said, we didn't receive a Step 3, and we're offering to settle a variety of grievances, and, quote, this offer is meant to bring about resolution to a number of outstanding grievances. And in the absence of resolution, notify the village that Local 3405 is invoking Step 4 of the grievance procedure. I don't know how much clearer it could have been to the village. And even the village manager in the underlying arbitration, Mr. Deachin, conceded that that's what this says. The letter was notifying the village that if you don't accept the settlement proposal, that we are hereby invoking arbitration of the grievance. And that's exactly what they did. The arbitrator, in analyzing the letter, said, on March 24th, the union invoked arbitration. If there was a Step 3 answer, which Mr. Deachin claimed there was not, it didn't occur until March 31st when he responded to this particular invocation of arbitration in the settlement proposal. And he said the union had already invoked arbitration prior to that time. The village has taken a number of inconsistent positions with respect to whether or not there was a Step 3 answer, depending on what form it's in. But we don't need to get to whether there was a Step 3 answer by virtue of the March 31st letter, because the arbitrator found, excuse me, that before the March 31st letter, the union had already invoked arbitration. The award on this issue plainly drew with essence from the contract. The village simply doesn't like the interpretation the arbitrator gave. Judge Martin correctly found, in granting the union's motion to confirm the award, that the village placed the issue of arbitrability, which it concedes here, before the arbitrator to resolve. And that's what he did. And he interpreted the contract, and he found the 10-day period runs from receipt of a Step 3, that the union, if there was a Step 3, had invoked arbitration before receipt of that, and there was no basis for the court to interfere with the arbitrator's interpretation of Article 4 of the contract. I just want to note very quickly, because there was some reference to a letter that is found at C-413 of the record, the letter that I actually wrote to counsel, not invoking arbitration on April 17th, that the way the process works is, once arbitration is invoked, in order to obtain an arbitrator, either the parties mutually agree, or a letter goes to federal mediation and conciliation services, requesting a panel of arbitrators. My April 17th letter, found at C-413, is not a letter invoking arbitration. It's a letter, after arbitration was already invoked, saying, we need a panel so we can select an arbitrator. And that's exactly what we did. From that panel, we selected, by use of the contractual grievance mechanism, arbitrator Kravitz. I'd now quickly like to return to the authority of the arbitrator rule on the issue of manning and of apparatus in shift manning. Again, the court only needs to look at three facts in the record to determine the arbitrator didn't exceed his authority in reaching this ruling. The face of the grievance, on the face of the grievance, the union, no less than four times, raises the issue of minimum manning. The grievance is found on the record at C-620, and also at C-67. The grievance is entitled minimum manning, shutting down of the squad, and other continuing violations. The grievance is starting on January 1, 2008, and continuing thereafter. They reduced minimum manning, they shut down the squad, they failed to call people in for overtime, they raised the articles that had been violated, including article, section 7.9, and they also said, excuse me, that they were not complying with minimum manning requirements on the squad, and otherwise. This grievance was not limited to the squad. This grievance clearly raised minimum manning requirements, and how section 7.9 was to be interpreted to determine whether there was a breach of the collective bargaining agreement. Because of those two words, and otherwise? Well, it was because minimum manning is raised, because in continuing thereafter, meaning subsequent to January 1, 2008, which was the date the squad was shut down, and otherwise correct. Well, wasn't there another grievance about that? The fire engines, for example? There was another grievance filed subsequent to that, which the union offered to consolidate into a single proceeding. It was a repetitive grievance, raising the same issues. We thought it should be resolved in one proceeding. Where's the letter that consolidates it? There wasn't consolidation. The employer refused to consolidate, and based on that, we tried the first case, which is the one before you. Once we got the decision of necessity, there was no need to try the second case, because the contract had already been interpreted. Next only looks at the second fact, which points to the scope of the grievance, and that is that at C-618, then she filed your response to the grievance. I'm going to ask you to go back and explain what you just said about, by necessity, it wasn't tried again. The issue before the arbitrator in both cases would have been minimum manning. Okay. Excuse me. In which two cases? In both cases? The first case that was filed, the grievance that went before arbitrator Kravitz. I thought that this was just the O-8 grievance. It is just a single grievance. One grievance. It was a single grievance that went before the arbitrator. Not consolidated with that. Not consolidated, because although the union believed both grievances addressed the same issue of minimum manning, it sought under the collective bargaining agreement and the grievance mechanism to consolidate them. The employer refused to consolidate them. So we then proceeded with the first case, which is what's before the court here. The second case, which also raised the issue of minimum manning, we never took to arbitration because we already had an interpretation of the collective bargaining agreement based on arbitrator Kravitz. So are you saying then that that one was mooted? It was mooted out by virtue of the first decision. Or are you saying that the arbitrator decided two grievances when only one was in front of him? No. Clearly he decided the issue that was raised in the instant grievance. He didn't have before him, nor did he know essentially what that grievance said. It was never presented to him. You just dealt with the engines. Wasn't that a different grievance? Wasn't that the 709 grievance? The grievance on the engines stemmed from something else, but the grievance pertaining to the engines was also part of this particular grievance that's before us because we were talking about failing to maintain minimum manning on equipment in addition to the squad, the quote, and otherwise language. And we put in evidence in this proceeding multiple orders that had been issued after January 108 where they kept changing how many people would be on the engine, how many people would be on the squad. And so this case properly before the arbitrator included, based on the face of the grievance, more than just the squad. Is the argument that you're presenting to us here today orally about the employer refusing the consolidation and then ultimately it becoming mooted addressed in your brief? No, because quite honestly it's not before this court. I think it's become an issue, but it's not before this court. The question is, based on the record here, did the arbitrator have the authority to reach the issue of minimum manning as he did? And it's the union's position that based on the face of the grievance, based on Chief Vollier's response to the grievance where he talks about a minimum of 21, he talks about minimum manning, and last but not least, based on counsel for the employer's statement during the hearing, and I quote, as to whether or not the interpretation of this contract, of the current agreement or of the 1992 agreement, sets a daily minimum or doesn't set a daily minimum. That's for you to determine. This is the village's attorney. There were two lawyers. It's a record citation. Yes. It's at page 81 of the transcript, and I have the transcript noted, and I apologize, at page, our appendix in our initial brief at 821. Okay. It's at page 81 of the transcript. He goes on to say, it's an issue before you, respectively, Mr. Kravitz, as to what does the contract say. Does it set a daily minimum or doesn't it? That's the primary issue in this case. Moreover, and noteworthy, not only did the attorney and two attorneys present, both made two separate law firms, both labor management attorneys, both sat there and said, this issue is before you. I don't know how you can come to this court now and say he didn't have authority. Also, the union posed the issue for the arbitrator to resolve in the case. The union said, the issue before you, Mr. Arbitrator, is whether the village violated Section 7.9 of the agreement and or the party's past practice by unilaterally modifying the minimum manning requirement below 21 personnel and, in turn, staffing equipment below the contractual requirements, and if so, what's the appropriate remedy? Even the arbitrator said the village didn't pose an issue. The village sat silent. It could have raised its own issue. It could have said at that time, you don't have authority to resolve that issue. Here's what we pose as the issue. But the arbitrator said that, based on the record, that was a proper framing of the issue before me. Basically, Judge Martin found that the grievance was extremely broad. It raised all of these topics, and the village placed the issue before the arbitrator. However, they agreed to allow the arbitrator to resolve the issue, and he had absolutely no basis to disturb that finding. Quickly, on the interpretation of Section 7.9, again, if any theoretical mind could have made the interpretation of the contract the arbitrator made, then this court cannot find that the arbitrator disregarded the contract, and the award has to be upheld. Basically, the arbitrator methodically went through Section 7.9, the minimum manning provision. He looked at the first paragraph, Section 7.9A. It talked about minimums. It talked about overtime. He says, and now in finding that there is a minimum, I need to take a look at Section B. He went through Section B. He determined that there was an ambiguity. The fact that somebody else doesn't think there's an ambiguity isn't the issue here. He found an ambiguity, and consistent with principles that he even noted, to determine the mutual intent of the parties in a contractual provision, if it's ambiguous, I have to turn to outside sources. Traditionally, in labor arbitration, those outside sources are- Are you saying that we, as a reviewing court, lack the power to decide whether he was right or wrong in finding ambiguity? Correct, unless no reasonable mind could make that interpretation. Counsel. Mm-hmm. Does the phrase best efforts, or is the phrase best efforts, in your opinion, directly? Is it mandatory? It's mandatory, and he interpreted best efforts, and he said, look it, I've listened to the uncontested testimony of the former chief, who was the one who proposed the contractual language I'm interpreting. He's told me what best efforts meant, and if you look at the transcript, former chief McCafflin, uncontested testimony, talked about best efforts. He talked about safety. He talked about why he needed minimum manning on the shift, and how he arrived at that. He went through all of that testimony. He also looked at 15 years of past practice, which is also used as a basis to interpret the mutual intent of the parties. He cited cases talking about how to interpret contractual language if you believe it's ambiguous. And after 15 years of constantly having a minimum of 22, which is why if it goes below, you have the overtime provision kick in, in 7.9A, and that's where he got to the daily minimum. And what he said is that when I look at the past practice of 15 years of constantly having 22, except by agreement to the parties in the last 10 years, they permitted it to go down, the union permitted it to go down to 21, with two on the squad instead of three on the squad. Again, because the employer came to the union and asked for a change in it, and the union acquiesced to that change. He basically said, look, it's clear what the mutual intent of these parties was. It was to have daily minimum staffing, and it was to have apparatus staffing. And I have to read everything as a whole. And he dissected that entire language. He used accepted principles of contract interpretation. And again, the position is nothing more than, I don't agree with the interpretation. If Mr. Kravitz was to read everything as a whole, would that also include Section 3 as it relates to managerial rights? Yes, and he did. He noted that managerial rights are limited specifically by other provisions of the contract. Specifically in Section 3 of the Collective Bargaining Agreement, the contractual language says that the village shall not exercise its rights inconsistent with or in conflict with other provisions of this agreement. Typically in Collective Bargaining Agreements, we have a broad management rights clause, and then any specific provision in the contract could limit those rights. However, here there is no question that the operations of the particular employer, how many they have on duty on minimum per day, minimum apparatus, those are restrictions of management rights because management and the union negotiated those provisions. In looking at 7.9A, the agreement says sufficient personnel and apparatus shall be maintained in a state of readiness at all times. Are you telling us that the village would like to rewrite this to say sufficient personnel or apparatus? Is that what they're trying to do here by saying that they can take apparatus out of service? Well, quite honestly, I think the village is attempting to rewrite the entire Section 7.9 in more than just that. That would be in part. But doesn't that come down to what we're talking about here, personnel and apparatus? Yes, and he looked at 7.9A, the arbitrator, and he said I have to have sufficient personnel and apparatus. Now I need to look at what that means. And that's when he turned to 7.9B. I know you asked a question regarding the meaning of 7.9C and the numbers weren't adding up. 7.9C is merely these are the minimum that you're supposed to maintain. The bargaining unit is well in excess of those numbers. The bargaining unit, although it's dwindled somewhat, is around the 80 range now. So it's not a question that that's all you have to have, but I just want to make sure we understand that the bargaining unit is substantially larger than- Actually, the whole bargaining unit, isn't it closer to 107? Not anymore. I wish it were, but- The arbitration, was it closer to 107? I would say closer to around that 100 range. I don't want to get you off your track, but I do have a question about what you're saying. You're saying that the requirement is that you have minimum manning, and the requirement is that the village will have within the parameters of public safety and public service equipment, apparatus, and personnel. And the personnel is defined, but the apparatus is not. Is that correct? Both are defined. When the arbitrator was relying on Chief McCasland to say what the past practice was, was he also relying on Chief McCasland when Chief McCasland said, in answer to the question, doesn't say how many engines, does it? And his answer was no. The question was four squads, and his answer was no. Wouldn't that be as important as a testimony about the past practice? He's acknowledging Chief McCasland, who incidentally was the person who testified, the union is my folks, because he used to be in the union for a long time. So he was protecting his guys. Understandable. Now he's the fire chief and the village manager, the time he was negotiating this contract. He wants to make sure he has his guys, his people taken care of. Correct. But in answer to the specific question, does the contract require a specific number of engines? No. Does it require squads? No. So aren't we supposed to look at that with as much importance as his testimony about the past practice? Well, I think what he was saying was that the contract does, it doesn't say a specific number, okay? For example, it says on each engine four employees. That's the language. And then he testified that we have X number of engines times four equates to 12 personnel. And then he said on each ALS ambulance, and I think even the testimony was that there wasn't a BLS ambulance anymore. There was an ALS ambulance. But what he was saying is that I have to have 22, and this is how they are distributed. And I think he also talked about what best efforts meant, and he said that, look, I could see that there was a situation, there could have been a situation, unlike the situation of the subject matter prescribance, but there could be a situation where some incident occurs, a structure fire or whatever, where I have to move my 21 people around. And if I don't need the squad as long as I have my 21 on a case-by-case situation, I could, as long as I have my minimum manning, change the operation on that given day. That was clearly what his best effort was. And his clear testimony was I have to have the 22, and this is how I am supposed to use them. My best efforts are to use them on this equipment. So Chief McCafflin and all the other witnesses were testifying that really it doesn't make too much difference what the equipment is as long as they have 22 bodies, that that's what they need on a shift divided among three stations to safely manage the fire needs and safety needs of this community. Well, in essence, as equipment has changed, the parties have over time bargained over how many people should be on the piece of equipment. They've run engines with five people? I mean, I'm sure there's been occasion where they've run with more than the minimum. They've run squads with two? They have run with squads with two by agreement of the union. Can I just go back to the subject of this specific arbitration? Absolutely. I really just said that they believe that this specific arbitration is only about the squads. And because of dropping the squads, the minimum manning has changed because of the squads being out, and the equipment has changed because of the squads being out, and they haven't used over time to call back people to run the squads because the squads being out. And you're telling me that no, this grievance also includes the fire engines. But I'm looking at the letter that was sent to Larry Beechin from Bob Lance on March 24th, grievance number 0709-1, properly staffed with three engines. And I don't see properly staffed with three engines any place in grievance 0801, which is the one in front of us. So I'm still curious about how the arbitrator got to staffing the engines. Where did that come from? He got to staffing the engines from the face of the grievance, the response to the grievance, and Mr. Cimenti's statement that it was a proper issue before the arbitrator. And, again, looking at the face of the grievance, as did, you know, Judge Martin. He said this is an extremely broad grievance. It talks about minimum manning throughout. It talks about squads and otherwise. There was a number of exhibits showing how they were reducing manning on the engines in the arbitration. No objection from the employer. Dead evidence is all in the record below. On a daily basis, then Chief Sawyer was changing the manning to not only be below the requisite number of people, but changing equipment, et cetera. There wasn't a single objection from both counsel representing the employer. That's because the issue was before him, and it was before him based on the scope of the grievance. Actually, on page 43 of the testimony, the village said, we see the issue as this. Did the village violate the contract? Was the village required to assign personnel to operate a squad? Did the village violate the contract by not calling from the overtime list? Again, I believe that they were talking exclusively about the squad, and that the squad is the only issue of this grievance. But that's not what he says later on. He says, did they have to call in for overtime? You only make it as a squad. If you look at it, you're looking at it one way, and I'm looking at it another way. I'm saying the fire engine is one issue, which was clear from the way the grievances were presented. 0709-1 was about the fire engine, and 0801 was about the squad. Isn't this analogous to a situation where a party makes an objection at the beginning of a trial, a motion in limine, and makes a statement as to what the issue is, and then the case is tried and other issues are brought into it and there's no objection. If there's not an objection made, how can the party later on complain about it? That's exactly right. And when you tell the arbitrator that you have the authority to do this, and the arbitrator looks at the face of the grievance, the Judge Martin looked at the face of the grievance and said, this grievance is as broad as it comes. I have to take a look at it. And he found that Mr. Trementi stipulated that the issue was properly before him. Now you're going to say, I don't like, what the village is saying is, I don't like the decision. I put it before him. I don't like the decision. And now I'm questioning whether, in fact, he interpreted it right. In other words, if they had a technical objection, they stated at the beginning of the proceeding and then all of the evidence comes in and they never object that, wait, you're arbitrating something else here. This is not what we're here to do. That never came up. That never came up. And specifically in the course of it, quite honestly, again, Mr. Trementi stipulated it was properly before him. Can I ask a question going back to the arbitrability issue? At the time of the union's letter to Deachen, there were still some discussions going on about some grievances, as I understand it from the testimony. Correct. Oh, yes. Multiple grievances. Ongoing discussions. Correct. How would anybody know, or does anybody know, or can you tell me whether this particular grievance, 0801, was the subject of any of those continuing discussions? Yes, it was. And when was the final meeting that would have resulted in a step three letter? The final meeting, well, and that's what the arbitrator was saying is there was a step, there is no question there was a step three meeting on, I believe, February 10th. And then there were continuing meetings. There were continuing meetings. To resolve this grievance. That's correct. My question, again, is when was the, he had 10 days from the last, from the meeting on this grievance to issue a step three letter. When was the last meeting on this grievance that would start his clock running for the 10 days? Well, his clock doesn't run from the 10 days, as the arbitrator found, until he, the clock doesn't run until there's actually the issuance of a step three answer. No, the contract says it's to present an answer within 10 days of the step three meeting. When was the step three meeting? The step three meeting was on the 10th, and the 10 days would have run from the 10th. But there were continuing meetings after that. Correct. Correct. So how could that have been a step three meeting? Because it was literally a step three meeting where the union comes in and presents its side, and it hears everything. There is no question that February 10th was a step three meeting. Okay. But then there were other meetings about this grievance after that. Why was it a step three meeting? Because those are settlement discussions where there's ongoing discussion about the grievance. Yeah, so a step three meeting is literally the, Mr. Deachin would have called the union in, the chief would have been present, the parties would have discussed the grievance, and he would have said, I'll let you know, you know, whether we're granting it or denying it. That was February 10th. The fact that parties frequently discuss beyond that step three meeting, settlement, discuss anything else regarding the grievance would not constitute a step three meeting within the meaning of the collective bargaining agreement. It doesn't change the date of the step three meeting. Does not change the date, correct. Okay. Can I quickly talk about 137? Sure. I know I'm well beyond my time. I just want to note one thing with respect to Supreme Court Rule 137. I think we've fully briefed this. By the way, the public policy decision I think we've fully briefed. The Labor Board has recently made a determination on the public policy issue that manning is a mandatory subject of bargaining. This arbitrator told the village essentially in his award that if you want to change Section 7.9, then there's a method to do it. It's called collective bargaining. You can go in and make contract proposals by statute under the Illinois Public Labor Relations Act. Firefighters have no right to strike, and therefore, because they have no right to strike, they have to go to final and binding interest arbitration where an arbitrator formulates the terms of the final contract. Parties are currently operating under an expired contract. This village could come in and make a proposal to change Section 7.9. It could raise an interest arbitration. It's budget issues. It could raise anything else that it felt supported a change in Section 7.9. But it is that forum that it has to be done in, not through this court, not through the lower court, not through the arbitrator who interpreted the language in the contract. Public policy management rights is not the public policy. The public policy in the state is found in Section 2 of the Illinois Public Labor Relations Act, and the public policy is a safety policy. Cases are overturned on public policy reasons for safety reasons, generally, if you look at the cases. This arbitrator promoted safety by making sure that there was sufficient manning, sufficient apparatus, not only for the safety of the firefighters, but the safety of the community. I think we're okay on that. Why don't you just give us a truncated version of your 137 argument, which has been fully briefed by both of you. Right. I'd just like to note a couple things. Look, the village might not have agreed with the decision, but it's pretty clear out there. Seventh Circuit cases have made it clear, and this court in the Abitai Center has pretty much fought that Rule 11, 137 interpretation. These aren't the kinds of cases that should burden the court. We may disagree who was right and who was wrong, but the arbitrator clearly ruled, and in a manner which should have been completely upheld by the court, and which was. What is interesting to note is, and I would urge you to look, at the positions of the village throughout this case that have changed over time, and there's some charts in our brief that show the changing of it. When Judge Martin ruled on the sanctions issue under 137, he made a finding that he didn't think, in a summary sentence, that there was bad faith. That's not the standard here. That's the standard set out in the brief. But I urge the court to look at the village's response to the sanction motion in the case below. At pages C-947 to C-954, which is the plaintiff's response to Local 3405's motion for sanctions. And in setting forth this argument, the village says, at page 6 of that actual motion, the village did not seek to challenge arbitrator Kravitz's interpretation of the collective bargaining agreement. I think that's why we're here. We're here because they have challenged the interpretation of the contract, the interpretation of arbitrability, the interpretation of Section 7.9. It stood before that court and said, we have meritorious arguments. We're not even challenging the interpretation. Throughout this entire proceeding, there have been misrepresentations to the court below. There was a letter that's the subject matter of bias. Note that bias, which was an argument made before the trial court that the arbitrator was biased, is not before the court here. And it wasn't until the final brief of the village on appeal here that they finally came up with an excuse as to why the inconsistent positions were being taken. And that is, we changed counsel. Your Honor, at this point in time, I don't care if you have one counsel, or in this case we've now had four counsel representing the village, two from different firms and now a third firm. The record below is the record below. There's a standard to be applied. And I think a message from this court has to be, just as the Seventh Circuit message has been out there, and that is, do not bother our back load with cases of this nature. There is a very high standard, and you know what the standard is. We shouldn't be here. I think that Judge Martin, he had taken a look at all of the evidence, and assuming there should be deference to his determination, and I think he applied the wrong standard of bad faith because the cases under 137 clearly say you don't need bad faith. There was no grounds to bring this case. There was no grounds to bring the case before the court. And here we are, and again, I'd urge, one way to get rid of court backlog is to send a message to litigants that arbitration awards, the public policy of the state is to uphold them, and you better have a viable valid basis for bringing it before the court to vacate it. Thank you. Thank you, counsel. I'll be very brief. I don't get a chance to say anything else here on rebuttal. I have to emphasize that the notion that the village sat on its hands and allowed the arbitrator to rule on issues about engine manning and shift manning and said nothing about it is absolutely absurd, and it's not supported by the record. In addition to the dialogue that counsel quoted, I'd like to point out to the court some other instances in the record that are in our brief. Record Volume 3, C674 to 675 is another set of dialogue where the village attorney tried to emphasize to the arbitrator that the scope of this grievance was quite narrow and didn't involve issues of engine manning and shift minimum manning. Also in our reply brief, I mean, the transcript here, the hearing transcript is 300 plus pages, and she's pointing out one, she's reading, her reading, one instance of dialogue between the arbitrator and the village's attorney to suggest the village sat on its hands and didn't say anything and was okay with the arbitrator issuing decisions on those issues. We absolutely were not. Another dialogue I'd point out, it's in our reply brief, it's also in Volume 3, C685 to 686 and C690 to 691. There were several instances of dialogue where an attempt was made by the village's attorney to remind the arbitrator that the grievance, the scope of the grievance was narrow. It should not have concerned engine manning. It should not have concerned minimum shift manning. You know, if the union got its way, there would be no instance where a court could review and scrutinize an arbitration award. They're coming here and telling you. Counsel, I think we're okay. Yeah. Different. I understand. I just want to emphasize that point that, you know, clearly there are instances where it's appropriate. We're familiar. Okay. I also wanted to just briefly speak on the notion, there were some questions raised about when the Step 3 meeting occurred. It's a discrepancy, but it's February 7, 2008 was when the Step 3 meeting happened. And all of the discussion about that there were settlement negotiations ongoing, that's not memorialized anywhere in this record. There was nothing that happened from February 7 to March 24 as far as the record goes. Counsel talked about ongoing settlement discussions, but it's just not there. If the court doesn't have any additional questions for me, I'm willing to rest on the briefs. I do want to say just a couple of things about the Rule 137 issue. I think the fact that we argued for an hour here without that even coming up is indicative that it's not the premier issue. It's not the thrust in this appeal. We're not subject to Rule 137 sanctions just because we didn't prevail in the trial court. We are here properly. There are legitimate reasons why we're seeking to have this arbitration award overturned. And this isn't CUNA. This isn't the Seventh Circuit case. It's a 2006 case. It's cited in their brief. There's been no Illinois case in five years that said we like CUNA and we're going to follow what the Seventh Circuit did in CUNA. I think if arbitration awards are rarely overturned, you know, Rule 137 sanctions of the nature that are being requested here are also very rarely given. Correct. I think that's a fair statement. Correct. And absent any other questions on that point, I'll rest on my briefs on that issue. Thank you for your attention. Great job by both of you. We'll take it under advisement.